1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                           NORTHERN DISTRICT OF CALIFORNIA

10                                     San Francisco Division

11    GOES INTERNATIONAL, AB, a corporation          No. 3:14-cv-05666-LB

12                        Plaintiff,                 ORDER GRANTING IN PART AND
                                                     DENYING IN PART THE DEFENDANTS'
13         v.                                        MOTION TO DISMISS FOR LACK OF
                                                     PERSONAL JURISDICTION
14    DODUR LTD., *et al.*,
                                                     [Re: ECF No. 34]
15                        Defendants.
      _____/
16

17                                        **INTRODUCTION**

18         Goes International, AB is a Swedish company that created, copyrighted, and then distributed a

19    bubble-shooting video game called *Bubble Bust*! (First Amended Complaint ("FAC"), ECF No. 27, ¶¶

20    2, 5-8, 29.)[1] It sued Dodur Ltd. and its shareholders (and game developers) Li Zhe and Zhou Ming, all

21    residents of China, for copyright infringement, alleging that they copied *Bubble Bust!* and marketed

22    the "virtually identical" and infringing games *Puzzle Bubble Free!* and *Puzzle Bubble Sea*. (*Id.* ¶¶ 1, 3,

23    12-15.) The defendants moved to dismiss Goes's initial complaint for lack of personal jurisdiction,

24    and Goes amended as a matter of right (adding fact allegations in its amended complaint that it took

25    from Dodur's declarations submitted in support of the first motion to dismiss). (*Id.*; *see* ECF No. 20.)

26    The defendants again moved to dismiss for lack of personal jurisdiction. (Motion, ECF No. 34.) The

27

28    _____
           [1] Citations are to the Electronic Case File ("ECF"); pin cites are to the ECF-generated page
      numbers at the tops of the documents.

      ORDER (No. 3:14-cv-5666-LB)

United States District Court

For the Northern District of California

1   court dismisses the individual defendants and denies the motion to dismiss Dodur.

2                                          **STATEMENT**

3       The fact allegations are from the FAC and from declarations that the parties submitted, including

4   the declarations of Wang Li Ming (the CEO of Dodur) and Mikael Makila (the CEO of Goes).

5   **I. DISTRIBUTION OF *BUBBLE BUST!***

6       Goes "conducts a great deal of its business in California, including distributing its games almost

7   exclusively through California businesses including Google Inc.'s Google Play and Apple Inc.'s App

8   Store." (*Id.* ¶ 2.) Goes has "published" *Bubble Bust!* on the Apple App Store since January 2011 and

9   on the Google Play online store since September 2012. (*Id.* ¶¶ 9, 10.)

10      From the release of *Bubble Bust!* to the present, Goes "directed more marketing efforts for *Bubble*

11  *Bust!* at the United States than any other country. *Bubble Bust!* has been downloaded over 2.5 million

12  times in the United States, generating substantial revenues from these downloads." (*Id.* ¶ 2.) Goes

13  "earns advertising revenue from people downloading and playing *Bubble Bust!*" (*Id.*) Goes also "earns

14  money when players make in-game purchases of additional content or game perks." (*Id.*) The

15  "advertising revenue comes almost exclusively from American companies." (*Id.*) "*Bubble Bust!* has

16  derived significantly more revenue from the U.S. market than any other market, including China. . . ."

17  (Makila Decl., ECF No. 37-1, ¶ 52.) For example, during the period up to September 24, 2013, 76% of

18  advertising revenues came from U.S. players, according to AppFigures, which Goes "used to track our

19  revenue data for that period." (*Id.* & Ex. 18.) "[T]his particular data is not available . . . post-

20  September 24, 2013, but . . . from tracking the data on a continual basis . . . this trend of much more

21  U.S. revenue more or less continued." (*Id.*) AppFigures also shows that approximately 40% of

22  revenue from in-game and premium-version purchases is from U.S. players. (*Id.* ¶ 53 & Exs. 19-20.)

23  Downloads are about 15% higher in China than in the U.S., but advertisers pay more for ad views

24  from players in the U.S. than from players in China. (*Id.* ¶ 54.) Thus players in the U.S. and other

25  affluent countries in Western Europe generate "significantly more revenue" than players in China.

26  (*Id.*) Goes "loses money" if players play an infringing game instead of Goes's game. (FAC ¶ 2.)

27  **II. COPYING *BUBBLE BUST!* AND DISTRIBUTING THE INFRINGING GAMES**

28      The defendants "distribute games through California distributors, including the Apple App Store."

United States District Court

For the Northern District of California

1  (*Id.* ¶ 3.) Goes alleges that the games *Puzzle Bubble Free!* and *Puzzle Bubble Sea* were "copied nearly

2  in . . . [their] entirety directly from *Bubble Bust!*" (*Id.* ¶ 12.) The defendants "obtained access to

3  *Bubble Bust!* by downloading it from the Apple App Store prior to January of 2012." (*Id.* ¶ 12.)

4  "Apple provides a host of tools . . . [and] support services and guidelines to third-party developers

5  who are licensed to provide applications through the App Store. Thus all applications for the Apple

6  App Store were built, in part, by Apple." (*Id.* ¶ 60.) In a February 4, 2015 email, Li Zhe said that

7  Dodur's former project manager in charge of the games copied *Bubble Bust!* "to cut his own work

8  load." (*Id.* ¶ 26; Lesowitz Decl., ECF No. 37-6, ¶ 5 & Ex. 4.) (Dodur now disputes this, saying that it

9  created the games from scratch. (Wang Decl., ECF No. 34-1, ¶ 10.))

10     Goes contends that in January 2012 (for *Puzzle Bubble Free!*) and March 2013 (for *Puzzle Bubble*

11  *Sea*), the defendants infringed Goes's copyright by "publishing and placing [the games] on the market

12  in the United States and in California through various websites including on the Apple App Store."

13  (FAC ¶¶ 12-13, 56.) The defendants updated *Puzzle Bubble Free!* frequently to incorporate new levels

14  taken from *Bubble Bust!* (*Id.* ¶ 20.) By distributing the games and their updates worldwide (including

15  in the U.S. and California) via the App Store, the defendants "generated revenue from the game

16  through services including Google Inc's Ad Mob." (*Id.* ¶ 12.) Apple's principal place of business and

17  its servers are in the Northern District of California. (*Id.* ¶¶ 12, 54.)

18     Dodur was the listed developer for *Puzzle Bubble Free!* (*Id.* ¶ 12.) The listed developer for *Puzzle*

19  *Bubble Sea* was Li Zhe and later changed to Zhou Ming. (*Id.* ¶ 13.) Goes alleges "on information and

20  belief" that both distributed *Puzzle Bubble Sea* through developer accounts in their own names, not

21  through a corporate account. (*Id.*) Because Zhou Ming and Li Zhe are shareholders, project managers,

22  and the game developers, Goes alleges on information and belief that they approved Dodur's decision

23  to upload the games to the Apple App Store. (*Id.* ¶¶ 13-14.) Dodur responds that they did not have

24  authority to make strategic decisions, which were made by a committee. (*See, e.g.*, Li Decl., ECF No.

25  34-3, ¶ 10.) Dodur's CEO confirms this position. (Wang Decl., ECF No. 34-1, ¶ 8.) The uploads were

26  to, and the downloads were from, Apple's servers in the Northern District. (FAC ¶ 54.)

27     To distribute the game through the App Store, Goes alleges that Zhou Ming and Li Zhe "had to

28  have agreed to the Apple developer license, stated they had the rights to distribute *Puzzle Bubble Sea*,

United States District Court

For the Northern District of California

chosen which countries to distribute the game in, and received revenues directed to their private accounts." (*Id.* ¶ 13; *see id.* ¶ 60 (Apple's requirements to offer an application through the App store).) When uploading the games (as they did 33 times for versions of the games), the defendants selected the countries where the games would be available for download, could have limited it to select countries or excluded the U.S., and instead chose to include the U.S. (*Id.* ¶ 58.) According to Goes, one selects worldwide distribution or specifies the countries. (Makila Decl., ECF NO. 37-1, ¶ 16.) Goes's review shows that the defendants uploaded *Puzzle Bubble Sea* in March 2013 for distribution to all countries except China, which had no downloads in the first five months of distribution. (*Id.* ¶¶ 16-19.) More specifically, Goes looked at download rankings for countries, saw that China had no ranking, and concluded that the only logical explanation is that the person who uploaded games "unclicked" China as a forum for distribution. (*Id.* ¶¶ 18-22.) According to Dodur, "worldwide" is the default setting, it used the default, it was not asked to "include specific geographical areas," and it released the games initially in China too. (Wang Decl., ECF No. 34-1 at ¶¶ 35-36.) The interfaces that Dodur uses to upload games and generate revenues are in Chinese. (*Id.* ¶ 37.) App developers must publish their applications through Google and Apple because they "virtually have a monopoly." (*Id.* ¶ 35.) Dodur does not target specific geographic areas. (*Id.* ¶ 40.)

Goes complained to Apple about the infringement, and Apple removed the games from the App Store on November 23, 2013. (FAC ¶ 21.) The games "are still widely available on other sites;" Goes provides examples of (a) a site for an unauthorized distributor of Apple iOS games and (b) Google Play in the form of an apparently early version of *Puzzle Bubble Free!* that is available for U.S. players. (*Id.* ¶ 21; *see* Makila Decl., ECF No. 37-1, ¶¶ 23-24, 26-30 & Exs. 3-7; Lesowitz Decl., ECF No. 37-6, ¶ 7) The defendants uploaded their games under a new name on the App Store in 2014, with distribution limited to Asia; the distributor is "one Yu Zhao," but "internally, the game still included DODUR LTD's logo and information." (FAC ¶ 28.)

## III. REVENUES TO DODUR FROM INFRINGING GAMES

*Puzzle Bubble Free!* and *Puzzle Bubble Sea* are free downloads. (Wang Decl. ¶ 24.) Revenue from free games is from advertising and in-game (or in-app) purchases. (*See id.*) The games contain advertisements that operate through Google's AdMob and, "on information and belief, Apple Inc's

United States District Court

For the Northern District of California

iAd and Yahoo! Inc's Flurry." (FAC ¶ 23.) Goes claims that the defendants receive revenue when their games are played and "have reaped millions of dollars in profits through the infringement" of Goes's games. (*Id.*) Google and Yahoo! are both Delaware corporations with their principal places of business in the Northern District of California. (*Id.* ¶ 24)

"On information and belief," Goes alleges that via the App store, (1) Dodur's infringing "games were downloaded at least 15 million times" before Apple removed them, and (2) Dodur "distributed at least 150,000 copies of *Puzzle Bubble Free!* to users in the United States" and "approximately 15,000 copies of *Puzzle Bubble Free!* to users in California." (*Id.* ¶¶ 22, 55.) Goes elaborates:

> On or about May 15, 2015, DODUR LTD. filed incomplete data in this case regarding the number of downloads of Defendants' Games. Even according to this incomplete data from Yahoo!'s Flurry service, it turns out that Defendants' Games were downloaded more in the United States and worldwide than PLAINTIFF initially estimated. For example, the Flurry data indicates that *Puzzle Bubble Free!* was downloaded at least 49,477 times in the United States from the Apple App Store [starting in June 2012, six months after release]; this represents merely a minimum. However, the Flurry data does not include any data for downloads during the first six months or so that *Puzzle Bubble Free!* was available for distribution on the App Store. According to App Annie, a reliable third-party provider of data on application downloads that is trusted in the industry, *Puzzle Bubble Free!* had a popularity ranking in the United States on the App Store that was higher during the first six months of its release than during the period thereafter. (App Annie provides reliable rankings of applications by downloads in a genre, but does not provide the exact number of downloads of an application.) Also, applications tend to be most popular during the time after initial release. Also, it is unclear how the Flurry data was obtained: depending on how the data was obtained, it could have not included all U.S. downloads even for the period that Flurry tracked. California accounts for approximately 12.2-percent of the population of the United States.

(*Id.* ¶ 55 & n.3.) Goes extrapolates from this to reach its total of at least 150,000 downloads:

> It is undisputed that over 50,000 people in the U.S. downloaded Defendants' Games starting in June of 2012, which was six months after *Puzzle Bubble Free!* was released (Defendants provided no data for the first six months). Accounting for the hard evidence that downloads were higher in the U.S. during the first three months of distribution, and the unreliability of Defendants' data, total distribution is estimated to be over 150,000.

(Opposition, ECF No. 37 at 10-11, citing FAC ¶ 55 and Makila Decl. ¶ 43 & Ex. 13.) Dodur responds in part that the number of downloads is different than the number of people who download. (Wang Decl. ¶ 8.) As to *Puzzle Bubble Sea*, Goes alleges, again on information and belief, that Dodur "distributed approximately 3,000 copies of *Puzzle Bubble Sea* to users in the United States via the Apple App Store" and "approximately 360 copies . . . to users in California." (FAC ¶ 56.)

Goes alleges Dodur's revenues on "information and belief." For *Puzzle Bubble Free!*, Dodur earned at least $35,000 in revenue in the United States: at least $27,000 in advertising revenues and at

United States District Court

For the Northern District of California

least $8,000 from in-game purchases. (*Id.* ¶ 57.) For *Puzzle Bubble Sea*, Dodur earned at least $1,000 in revenue in the United States: at least $750 from advertising revenues and at least $250 from in-game purchases. (*Id.*) Both games had at least four in-game purchases at prices ranging from $0.99 to $3.99 through the Apple Store. (*Id.*)

Dodur responds that Goes has no support for its figures, U.S. revenue was less than $2,200, and U.S. downloads were 0.39% of worldwide downloads. (Wang Decl., ECF No. 34-1, ¶¶ 13, 32.) Worldwide downloads were (1) 13,077,797 downloads of *Bubble Free!* from June 19, 2012 to May 12, 2015, and (2) 203,383 downloads of *Bubble Sea* from March 6, 2013 (the date it became available) to May 12, 2015. (*Id.* ¶¶ 15-16.) Dodur estimates that China downloads are 88% of worldwide user downloads: (1) 11,458,093 China downloads of *Puzzle Bubble Free!* from June 19, 2012 to May 12, 2015, and (2) 167,341 China downloads of *Puzzle Bubble Sea* from March 6, 2013 to May 12, 2015. (*Id.* ¶¶ 21-23.) Dodur says that in-app purchases were available, but the revenue for all of Dodur's games was insignificant: $241.50 in 2012 and 2013. (*Id.* ¶ 24.) No in-app purchases are attributable to *Puzzle Bubble Sea*. (*Id.*) Its revenue comes from advertising. (*Id.* ¶ 25.) Dodur only tracks worldwide revenues (and not its U.S. revenues) from *Puzzle Bubble Free!* and *Puzzle Bubble Sea*: its records show total worldwide revenue for both of $41,430.08 broken down as follows: (1) $41,116.37 for *Puzzle Bubble Free!* from January 8, 2012 to May 12, 2015 and (2) $313.71 for *Puzzle Bubble Sea* until May 12, 2015. (*Id.* ¶ 27.) Dodur used sampling methodologies to estimate the total U.S. advertising revenues of slightly less than $2,200. (*Id.* ¶¶ 28-32.)

Goes objects to Dodur's conclusions based on foundation (because Mr. Wang was not part of Dodur at the time of the infringing activities), discrepancies in calculations, and reliability (due to a flawed methodology). (Opposition, ECF No. 37 at 11-12 (citing Makila Decl., ECF No. 37-1, ¶¶ 12, 39-45); Objections, ECF No. 42.) Goes's CEO opines (from experience working on applications that generate ad revenue and from his review of industry data from trusted and reliable sources) that it is unreasonable for an application that generates revenue from providers such as AdMob to generate less than $100,000 from an application that received 13 million downloads. (Makila Decl., ECF No. 37-1, ¶ 39.) His review of the Wang Declaration shows 897 million playing sessions from roughly 13 million new users (an average of 69 sessions per user with a median length of 4.5 minutes). (*Id.* ¶ 40.)

United States District Court

For the Northern District of California

That means 310 minutes per average user (69 sessions x 4.5 minutes). (*Id.*) Based on playing the game and his experience in the industry, it is reasonable to assume that the game displays 2 ads per minute. (*Id.*) That is 310 minutes x 2 = 620 ads per user, which (based on the AdMob 92% fill rate in the Wang Declaration) results in $1.04 million in total advertising revenue (based on average ad revenue of 14 cents per 1,000 ad views = $.08 per user x 13 million = $1.04 million). (*Id.*) With 52,000 U.S. users, that should be (even according to the "underreported data" from the Wang declaration) $8,320 (52,000 users x $.16). (*Id.* ¶ 41.) He analyzes metrics and concludes that revenue should be higher in the first five months of the game's release (where Dodur omitted – or does not have – data.) (*Id.* ¶¶ 42-44.) He also asserts that Mr. Wang cannot extrapolate from Apple iAd data the revenues attributable to in-app purchases. (*Id.* ¶ 45.)

Dodur objects to the Makila declaration as an improper opinion because Mr. Makila is not qualified as an expert. (Reply, ECF No. 39 at 8.)

The court overrules both parties' objections: there is adequate foundation for the court to consider the declarations (although the objections go to the weight that the court gives them).

Goes asked Dodur to stipulate to take jurisdictional discovery. (Lesowitz Decl., ECF No. 37-6, ¶ 3.) Dodur responded that the number of downloads and the amount of revenue are not relevant to whether there is personal jurisdiction. (*Id.*) At oral argument, Goes represented that the downloads in the U.S. and worldwide (and presumably revenue) could be ascertained via third-party subpoenas.

## IV. OTHER CONTACTS WITH THE FORUM

Goes alleges that Dodur marketed its games to the U.S. and targeted U.S. players. (FAC ¶ 62.) Dodur had an English-language website (in addition to its Chinese-language website). (*Id.*) Both games were playable in English, Chinese, or Japanese. (*Id.*) Dodur "provided online customer service directed at the United States . . . [and] communicated directly with American consumers by providing answers in English to questions posed in English by American consumers." (*Id.*)

To upload the games to the Apple App store, the defendants had to appoint Apple as their agent "in regards to marketing and delivery" of their games and thus "appointed a California corporation as its agents to distribute Defendants' Games within California and the rest of the United States." (*Id.* ¶ 59.) They agreed to submit to jurisdiction in California in any lawsuit with Apple regarding the

United States District Court

For the Northern District of California

games. (*Id.*) To offer an application through its App store, a developer must agree to the Apple iOS Developer Program License Agreement with Apple and pay a $99 fee. (*Id.* ¶ 60.) "To further control the applications offered through the App store, Apple provides third-party developers with review guidelines, and conducts a review of all applications submitted for inclusion in the App store for compliance with these documents." (*Id.*)

Dodur's infringing games generated revenues from Google, Inc.'s AdMob Service. (*Id.* ¶ 63.) To use AdMob, the defendants had to agree to jurisdiction in California in any lawsuit with Google regarding the games. (*Id.*) Similarly, Goes alleges "on information and belief" that the defendants used Yahoo!'s Flurry service for marketing and research to generate advertising revenue and had to agree to jurisdiction in courts located in San Francisco in any lawsuit over the terms of service with Yahoo! (*Id.*) When the defendants entered into agreements for services with Apple, Google, and Yahoo!, they warranted they did not infringe any third party's intellectual-property rights, and they agreed to indemnify Apple, Google, and Yahoo! "if these warranties of IP ownership were false (and all such warranties were false)." (*Id.* ¶ 64.)

Advertisements to U.S. players of the defendants' games were targeted to the U.S. market: "[p]layers in the United States saw advertisements that were appropriate to American consumers[] such as advertisements in English for American businesses and American products." (*Id.* ¶ 65.)

Dodur states online that it "specializes in the development of games in the United States, China, Japan, and other markets." (*Id.* ¶ 66.) The defendants frequently distribute applications through the Apple App Store and Google Play; since the beginning of 2012 Dodur distributed at least 19 applications, Zhou Ming distributed at least four, and Li Zhe distributed at least seven. (*Id.* ¶ 67.)

Dodur declares that its employees all live in China and have never traveled to the United States. (Wang Decl., ECF No. 34-1, ¶ 34.)

## V. OTHER INFORMATION

At oral argument, the court asked whether – given the takedown of the games from the Apple App Store – there was a negotiated solution (such as a stipulated judgment) that would give Goes a formal mechanism to take down infringing copies of the games that might exist on other sites. Dodur said that it would agree to that solution. Goes explained that it wanted to obtain data from all of Dodur's sales

United States District Court

For the Northern District of California

1  and then brief whether it is entitled to damages calculated from Dodur's worldwide revenues (as

2  opposed to damages from revenues attributable to U.S. customers). *See Los Angeles News Serv. v.*

3  *Reuters Television Int'l Ltd.*, 340 F.3d 926, 928 (9th Cir. 2003). Dodur said that it suspected that Goes

4  was no longer developing games.

5      At the hearing, the parties acknowledged that Dodur was assuming responsibility for the alleged

6  copyright infringement by declaring that the individually named defendants Li Zhe and Zhou Ming

7  (who no longer work at Dodur) had no independent authority to do anything without company

8  approval and have no ownership rights in the two infringing games. (*Accord* Wang Decl., ECF No.

9  34-1, ¶ 8, 10; Li Decl., ECF No. 34-3, ¶¶ 8-10; Zhou Decl., ECF No. 34-4, ¶¶ 8-10.) Goes said that it

10  named them to avoid a situation where the company blamed the individuals and said (essentially) that

11  the important thing was that the court find personal jurisdiction over Dodur.

12      Dodur points out that Goes did not register *Bubble Bust!* within three months of publication.

13  (Motion, ECF No. 34 at 10-11, citing FAC ¶¶ 7-9, 12, 15 (publication and registration dates).) That

14  means that there are no statutory fees or damages under 17 U.S.C. § 412(2). (*Id.*, citing 17 U.S.C.

15  § 412(2) (no award of statutory damages or attorney's fees after "first publication of the work and

16  before the effective date of its registration, unless such registration is made within three months after

17  the first publication of the work").) Dodur points out that Goes admits that *Bubble Free!* and *Bubble*

18  *Sea* are "virtually the same." (*Id.* at 11, citing FAC ¶ 15.) Dodur asserts that as a result, statutory

19  damages and attorney's fees are not recoverable for *Bubble Sea* either. (*Id.,* citing *Derek Andrew, Inc.*

20  *v. Poof Apparel Corp.*, 528 F.3d 696, 700-01 (9th Cir. 2008).)

21                                          **ANALYSIS**

22      The defendants move to dismiss the complaint for lack of personal jurisdiction. *See* Fed. R. Civ. P.

23  12(b)(2). The plaintiff has the burden of establishing jurisdiction. *Boschetto v. Hansing*, 539 F.3d

24  1011, 1015 (9th Cir. 2008). "[T]he court may consider evidence presented in affidavits to assist in its

25  determination and may order discovery on the jurisdictional issues." *Doe v. Unocal Corp.*, 248 F.3d

26  915, 922 (9th Cir. 2001). The plaintiff "need only make a prima facie showing of personal

27  jurisdiction." *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 (9th Cir. 2009);

28  *Data Disc Inc. v. System Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). The plaintiff cannot

"simply rest on the bare allegations of its complaint," but uncontroverted allegations in the complaint must be taken as true, and "[c]onflicts between the parties over statements contained in the affidavits must be resolved in the plaintiff's favor." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). A prima facie showing means that "the plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant." *Unocal*, 248 F.3d at 922.

"The general rule is that personal jurisdiction over a defendant is proper if it is permitted by a long-arm statute and if the exercise of that jurisdiction does not violate federal due process." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154-55 (9th Cir. 2005) (citation omitted). "[B]oth the California long-arm statute and Rule 4(k)(2) – what is often referred to as the federal long-arm statute – require compliance with due process requirements." *Id.* (citations omitted); *accord Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014); *see also* Fed. R. Civ. P. 4(k)(2). Due process requires that the defendant must have minimum contacts with the forum such that the assertion of jurisdiction in that forum "'does not offend traditional notions of fair play and substantial justice.'" *Pebble Beach*, 453 F.3d at 1155 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 315 (1945)).

There are two types of personal jurisdiction: general and specific. *See Daimler*, 134 S. Ct. at 754-55. Goes does not assert general personal jurisdiction but instead asserts specific personal jurisdiction. (*See* Opposition, ECF No. 37 at 16.) Goes does not argue that the defendants purposefully directed their actions at California; instead it asserts that the defendants have "minimum contacts" with the United States as a whole that subject them to personal jurisdiction under Federal Rule of Civil Procedure 4(k)(2). (*Id.* at 16-26.)

"The exercise of Rule 4(k)(2) as a federal long-arm statute requires the plaintiff to prove three factors:" (1) the claim against the defendants arises under federal law; (2) the defendants are not subject to jurisdiction in any state's court of general jurisdiction; and (3) exercising jurisdiction comports with due process. *Pebble Beach*, 453 F.3d at 1159; *see* Fed. R. Civ. P. 4(k)(2). The first factor is met: the claim is a federal copyright claim. The second factor is met too: the defendants are foreign defendants who reside in China, and it is uncontested that they are not subject to jurisdiction in any state's court of general jurisdiction. Moreover, because proving lack of personal jurisdiction in every state "could be quite onerous," and because "it is the defendant, not the plaintiff, that likely

possesses most of the information necessary to do so," "[a] defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed." *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 461-62 (9th Cir. 2007) (citation and quotation omitted). "[A]bsent any statement from . . . [Dodur] that it is subject to the courts of general jurisdiction in another state, the second requirement of Rule 4(k)(2) is met." *Id.* at 462.

The remaining factor is that the exercise of personal jurisdiction must comport with due process. *Id.* "The due process analysis under Rule 4(k)(2) is nearly identical to the traditional personal jurisdiction analysis with one significant difference: rather than considering contacts between the . . . [defendants] and the forum state, we consider contacts with the nation as a whole." *Id.* (citing *Pebble Beach* , 453 F.3d at 1159). "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (quotation omitted). The Ninth Circuit employs a three-part test to determine whether a defendant has sufficient minimum contacts to be subject to specific personal jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) The claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) The exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 672 (9th Cir. 2012).

The plaintiff has the burden of satisfying the first two prongs of the test. *Id.* The burden then shifts to defendants to present a compelling case that the exercise of jurisdiction would be unreasonable. *Id.*

## I. PURPOSEFUL DIRECTION

The first prong requires a defendant to purposefully avail itself of the privilege of conducting business activities within the forum or purposefully direct activities toward the forum. *See Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998). Evidence of availment is typically action taking place in the forum that invokes the benefits and protection of the laws in the

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1   forum. *Pebble Beach*, 453 F.3d at 1155. Goes argues only purposeful direction in the form of actions

2   outside the forum aimed at the United States. (Opposition, ECF No. 37 at 18.) Indeed, courts analyze

3   tort claims—such as the copyright claim here—under the purposeful direction test. *See Mavrix Photo,*

4   *Inc. v. Brand Techns., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011); *LiveCareer Ltd. v. Su Jia Techn.*

5   *Ltd.*, No. C 14-03336-JST, 2015 WL 1448505, at * 3 (N.D. Cal. Mar. 31, 2015).

6        Purposeful direction exists when a defendant commits an act outside the forum that was intended

7   to and does in fact cause injury within the forum. *Calder v. Jones*, 465 U.S. 783, 788-89 (1984).

8   Under the "effects" test, the defendant must (1) commit an intentional act (2) expressly aimed at the

9   forum (3) that causes harm that the defendant knows is likely to be suffered in the forum. *Washington*

10  *Shoe*, 704 F.3d at 673 (quoting *Mavrix*, 647 F.3d at 1228). The "'effects' test . . . focuses on the forum

11  in which the defendant's actions were felt, whether or not the actions themselves occurred within the

12  forum." *Mavrix*, 647 F.3d at 1228. "However, referring to the *Calder* test as an 'effects' test can be

13  misleading. For this reason, we have warned courts not to focus too narrowly on the test's third

14  prong–the effects prong–holding that 'something more' is needed in addition to a mere foreseeable

15  effect." *Pebble Beach*, 453 F.3d at 1156 (citation omitted).

16       It is undisputed that distributing infringing games is (if true) an intentional act. The parties dispute

17  whether Dodur's acts were expressly aimed at the U.S. and whether Goes suffered jurisdictionally

18  significant harm in the U.S. *See Mavrix*, 647 F.3d at 1229, 1231.

19  **A. Acts Expressly Aimed at the United States**

20       Goes identifies the following acts by the defendants that were expressly aimed at the U.S.:

21  (1) downloading *Bubble Bust!* from Apple's App Store (housed on Apple's U.S. servers); (2) using

22  Apple software to create a copy; (3) uploading the infringing games to the App Store for distribution;

23  (4) making the games available for distribution to U.S. consumers; (5) generating revenue from

24  U.S.advertising services; (6) agreeing to jurisdiction in California with Apple and Google for any

25  lawsuits involving the games; (7) agreeing to make Apple their agents for distribution and marketing;

26  (8) distributing a version of *Puzzle Bubble Free!* via the unauthorized distributor of Apple iOS

27  games; and (9) taking steps to appeal to English speakers. (Opposition, ECF NO. 37 at 18-19.)

28       The parties have not cited, and the court has not identified, a copyright case that addresses

definitively the exercise of specific personal jurisdiction over a foreign defendant whose only action aimed at the U.S. is the distribution of a mobile application to consumers (including U.S. consumers) who obtain it from U.S.-hosted websites such as the Apple App store. But based on Ninth Circuit cases in the virtual and bricks-and-mortar worlds, the court thinks that the defendants' acts of distributing infringing games to U.S. consumers and generating revenue (and diverting consumers from Goes's games) are acts "expressly aimed" at the U.S.

In *Holland America*, a purposeful-availment case, the Ninth Circuit found no specific jurisdiction over a Finnish manufacturer responsible for a defective engine part that resulted in a fire on a cruise ship in Haiti in part because (1) it sold no products directly into the U.S. market, (2) its holding company's web presence was passive and provided only information on products, and (3) its "unspecified" advertisements in various marine publications "hardly constitute significant contacts." *See* 485 F.3d at 454, 459-62. Because the case involved only the introduction of a product into the stream of commerce and other contacts with the U.S. that were "scant, fleeting, and attenuated," the court did not find nationwide jurisdiction. *Id.* at 462. The court contrasted cases where foreign defendants had much more extensive contacts, such as defendants conspiring to bomb sites in New York or an foreign insurer directly insuring hundreds of claims in the United States. *Id.* (citing *Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005); *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004)). Unlike *Holland America*, this case involves the intentional distribution of infringing products in the United States to U.S. consumers.

Another national-contacts case is *Pebble Beach*, a trademark-infringement case, where the alleged infringer ran a hotel in England without targeting any advertising toward U.S. consumers. 453 F.3d at 1153-54. The defendant operated a website with a .com domain name (as opposed to a .uk or .eu domain name), hosted Americans at the hotel, and was a dual citizen who had worked in California and knew about the famed golf course. *Id.* The court held that those extraterritorial acts were not expressly aimed at the United States. *Id.* at 1159. In contrast to those attenuated connections, the defendants distributed infringing products in the United States to U.S. customers for revenue.

At the hearing, Dodur argued that it was merely putting its products in the stream of commerce and did not direct any acts to the United States. It cited *Asahi Metal Indus. Co. v. Superior Court of*

United States District Court

For the Northern District of California

1    *Cal.*, 480 U.S. 102 (1987). In *Asahi*, a Japanese tire-valve manufacturer sold its products to a Chinese

2    tire manufacturer, knowing its product would be incorporated in tires sold in the U.S. *Id.* at 106. Mere

3    "awareness" is not the substantial connection necessary to find minimum contacts. *Id.* at 112. Other

4    cases similarly hold that merely putting products into the stream of commerce is not action expressly

5    aimed at a forum. *See, e.g., Holland America*, 485 F.3d at 462. Dodur's argument essentially is that

6    the only way to deliver its app to its targeted base (China) is via the App Store. And its selection of a

7    default of worldwide distribution is not purposeful direction because it does not involve "targeting"

8    activities (such as ads or marketing to U.S. customers) that one sees in Internet purposeful-direction

9    cases. (*See* Motion, ECF No. 34 at 22-23.) All it is doing, it says, is putting its product into the stream

10   of commerce the only way it can. (*Id.*) It points to the low revenue numbers as corroboration for its

11   point that it is not aiming its acts to the U.S. forum.

12        The court thinks that Dodur is doing more than putting its product in the stream of commerce with

13   no acts aimed at the forum. The world-wide distribution here included U.S. customers and happened

14   not by an intervening decision of a distributor such as the Chinese tire maker in *Asahi* but instead by

15   Dodur itself. The allegedly infringing game is a copy of a Goes game popular with U.S. players, who

16   receive ads targeted to them. Goes receives revenue mainly due to U.S. players. It is significant that an

17   infringing game is being distributed in a marketplace that includes U.S. players, even if the means for

18   distribution is selecting the default of "worldwide" distribution. Dodur suggests (but does not say

19   overtly) that selection is passive, but according to Goes, one has to "select" default or country-specific

20   distribution (and thus necessarily include the U.S. by selecting the default). The court resolves any

21   conflicts in the declarations in Goes's favor, *see Schwarzenegger*, 374 F.3d at 800, and concludes (on

22   this record) that the distribution of the games for commercial gain in the U.S. forum constitutes

23   purposeful direction. *See Gucci America, Inc. v. Wang Huoquing*, No. C 09-05969-JCS, 2011 WL

24   31191, at * 5 (N.D. Cal. Jan. 3, 2011) ("Personal jurisdiction is appropriate where an entity is

25   conducting business over the internet and has offered for sale and sold its products to forum

26   residents."), *adopted*, 2011 WL 30972 (N.D. Cal. Jan. 5, 2011). A contrary result might mean that

27   Goes would have no forum to challenge the alleged infringement of its U.S. copyrights. *Cf. Zherebko

28   v. Reutskyy*, No. C 13-00843 JSW, 2013 WL 4407485, at * 5 (N.D. Cal. August 12, 2013) (suggesting

United States District Court

For the Northern District of California

1   the availability of an alternate forum); *see also Doe v. Geller*, 533 F. Supp. 2d 996, 1003 (N.D. Cal.

2   Feb. 4, 2008) (discussing application of U.S. copyright law extraterritorially and to cross-border

3   communications).[2] The court also thinks the amount of revenue is better addressed in the next section

4   about the extent of the harm.

5        Dodur argues that Goes is a foreign company and "has no presence" in the U.S. Reply, ECF No.

6   39 at 10-11 (citing *Zherebko*, 2013 WL 3307485, at *3.) It elaborates that a plaintiff rarely claims

7   injury in a state other than its own state, and a corporation suffers harm in its place of business. (*Id.* at

8   11-12.) *Zherebko* involved a Ukrainian game developer's lawsuit alleging copyright infringement and

9   breach of an oral contract by a European developer who distributed an infringing game through Apple

10  and Google. *See* 2013 WL 4407485, at *1. The plaintiff was not a California resident and did not

11  allege any ownership interest in a California business, ownership or lease of any property, or any bank

12  account or telephone listing. *Id.* at *3. The court held that absent indicia of residency in California

13  such as property ownership, voting registration, and place of business, the European developer's acts

14  were not "expressly aimed" at any victim in California. *Id.* ("if the victim is not a resident of

15  California, even an intentional misuse of intellectual property is not 'expressly aimed' at California")

16  (citing *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 609 n.4 (9th Cir. 2010)).

17       *Zherebko* does not preclude this lawsuit. That case involved no ties to the forum California (other

18  than an allegation that disputes in connection with the game were subject to the jurisdiction and venue

19  of courts in Santa Clara County). *Id.* at *1. Unremarkably, the court held that there could be no injury

20  in the forum if the victim had no presence in it. By contrast, Goes points to its substantial business and

21  revenue in the United States generated from U.S. players. *Zherebko*'s citation to *Love* does not change

---

22

23       [2] The court does not base its holding on the presence of a forum-selection clause in the

24  defendants' agreements with Apple and Google, the defendants' English-language (at least in part)
    website, the defendants' other games, or distributing a version of *Puzzle Bubble Free!* via the

25  unauthorized distributor. The first fact is relevant for lawsuits about the agreements, but the court is not
    convinced that it is relevant for the purposeful-direction argument that Goes advances here. The second

26  fact at best establishes that the defendants have a website that offers information that does not appear
    to be targeted to a U.S. audience. *Compare Pebble Beach*, 453 F.3d at 1159. After all, English is a

27  lingua franca. Goes's declaration that it is uncommon for Chinese gaming culture to publish games in
    English does not change the court's conclusion. (*See* O'Young Decl., ECF No. 37-7, ¶ 5.) The third and

28  fourth facts are not relevant to the injury alleged here. *See NuboNau, Inc. v. N.B. Labs, Ltd.*, No. C 10-
    2631-LAB, 2012 WL 843503, at *4 (S.D. Cal. March 9, 2012).

the outcome either. *Love* said that the "expressly aimed" prong "can be met" where a plaintiff alleges that the defendant individually targeted him by misusing his property on the defendant's website for the purpose of competing with the plaintiff in the forum. *Love*, 611 F.3d at 609 n.4 (citing *Brayton Purcell*, 606 F.3d at 1129-30). It did not say "can only be met."

Other cases support the conclusion that a plaintiff can sue for copyright infringement in a forum where the plaintiff suffers injury to its business interests. For example, in *Mavrix*, a Florida company with L.A. offices sued an Ohio-based celebrity-gossip website for copyright infringement for posting the plaintiff's photographs. *See* 647 F.3d at 1221-22. The court found specific personal jurisdiction in the Central District of California based on the defendant's interactive website with a large national audience. *Id.* at 1230. The court observed that the focus of the effects test is where the injury is felt, not where the actions took place. *Id.* at 1231. That determination can involve several factors, including the interactivity of a defendant's website, the geographic scope of the defendant's commercial ambitions, and whether the defendant individually targeted a plaintiff known to be a foreign resident. *Id.* at 1229 (citing *Pebble Beach*, 453 F.3d at 1156-58; *Brayton Purcell*, 606 F.3d at 1129; *Panovision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321-22 (9th Cir. 1998); *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 417-20 (9th Cir. 1997)). The court concluded that the defendant used the plaintiff's copyrighted photographs as part of its exploitation of the California market for its personal gain, including revenue from third-party advertisements targeting California visitors to its website. *Id.* at 1229-30. It did not matter that the plaintiff also suffered harm in Florida: "[o]ur precedents recognize that in appropriate circumstances, a corporation can suffer economic harm both where the bad acts occurred and where the corporation has its principal place of business." *Id.* at 1231 (quotation omitted).

Here, the defendants allegedly copied Goes's game and distributed infringing games to U.S. players, resulting in roughly 50,000 undisputed downloads and (extrapolating from that number) possibly 150,000 total downloads and resulting revenues. As in *Mavrix*, there is exploitation of the forum market for commercial gain and resulting harm to the copyright holder. The defendants' actions are geared toward distribution of its allegedly infringing products to U.S. consumers via a U.S. commercial platform. That also makes this case different from *DFSB Kollective Co. v. Bourne*, where

there was no evidence connecting California consumers to the foreign defendant's website that permitted free illegal downloads of music. 897 F. Supp. 2d 871, 874-76 (N.D. Cal. 2012). It also is different from cases that involve only website sales without any direct marketing to forum consumers. *See, e.g., NuboNau, Inc. v. NB Labs, Ltd.*, No. C 10-2631-LAB, 2012 WL 843503, at *3-*4 (S.D. Cal. Mar. 9, 2012). It is different too from cases where the plaintiff creates the defendant's contacts with the forum. *See id.* (the plaintiff's agents placed the two orders at issue).

The defendants nonetheless try to distinguish *Mavrix* (and similar cases involving non-resident plaintiffs) as all involving at least some physical presence by the plaintiff in the forum. Reply, ECF No. 39 at 12 (referring to brick-and-mortar stores, employees, offices, agents for service of process, and payment of taxes). But stores are not just physical any more: they are virtual. And even in virtual marketplaces, acts can be and are aimed at the forum when the consumers are in the forum and the revenues are earned (or diverted) in the forum. After all, the "effects test" focuses on "the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum." *Mavrix*, 647 F.3d at 1228. The *Mavrix* court observed that the defendant's "theory of jurisdiction would allow corporations whose websites exploit a national market to defeat jurisdiction in states where those websites generate substantial profits from local consumers." *Id.* at 1231. "[W]here individuals purposefully derive benefit from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise predictably from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473-74 (1985) (quotation omitted)).

### B. Jurisdictionally Significant Harm

That does not end the inquiry because the "expressly aimed" requirement is a necessary but not sufficient condition for jurisdiction. *Id.* In order to establish jurisdiction, a plaintiff also must show that it suffered jurisdictionally significant harm in the forum, which here is the United States. *Id.*

First, it does not matter that Goes may also have suffered jurisdictionally significant economic harm in other forums such as its principal place of business in Sweden. *See Mavrix*, 647 F.3d at 1221-22. Again, "[o]ur precedents recognize that in appropriate circumstances, a corporation can suffer

economic harm both where the bad acts occurred and where the corporation has its principal place of business." *Id.* at 1231 (quotation omitted). "[J]urisdictionally significant harm may be suffered in multiple forums." *Id.* (quotation omitted).

Second, as in *Mavrix*, the defendants allegedly interfered with the plaintiff's copyright, resulting in foreseeable economic harm in the U.S. in the form of revenues. *Id.* at 1231-32. The issue is whether the harm is jurisdictionally significant. *Id.* at 1231 (quotation omitted).

In *Mavrix*, the court concluded that the harm there was jurisdictionally significant. *Id.* at 1231-32. The plaintiff Mavrix had 35 copyrighted photographs of the singer Fergie and her husband, the actor Josh Duhamel, vacationing in the Bahamas. *Id.* at 1222. The defendant Brand was a "large media entity" with a national audience that ran a celebrity gossip website that was "very popular." *Id.* The *Mavrix* court found that the republishing interfered with the exclusive ownership of the photos and destroyed their market value, resulting in foreseeable economic loss, not only in Florida (Mavrix's principal place of business), but also in California. *Id.* at 1222, 1231. "A substantial part of the photos' value was based on the fact that a significant number of Californians would have bought publications such as *People* and *Us Weekly* in order to see the photos." *Id.* at 1231-32. Brand's "actions destroyed this California-based value." *Id.* at 1232.

Goes's allegations of harm are not as compelling as those in *Mavrix*, where the defendant published celebrity photos on a popular site that obviously and foreseeably destroyed publication value in the California forum. And they differ in kind from the significant harm in *Graduate Mgmt. Admission Council v. Raju*, where the defendant operated a website in India that sold copyrighted questions from the GMAT test to customers around the world. 241 F. Supp. 2d 589, 590-91 (E.D. Va. 2003). The website in India targeted U.S. consumers, gave testimonials (three of the total six) from U.S. consumers, and promoted the materials as allowing "American citizens and others to catch up with [superior] test takers from 'India, China, Korea, Japan, and Taiwan' who . . . score better than 'their American or European counterparts . . . because most of them have access to 100 percent of unpublished previous questions. . . .'" *Id.* at 598 (quoting promotional text). The court easily found acts directed at the United States "with the manifested intent of engaging in business" within the United States and thus found personal jurisdiction comporting with due process. *Id.* at 598-99.

Still, the court thinks that Goes has alleged enough. Dodur distributed infringing games in the U.S., resulting in revenue generated from U.S. players, including revenue from ads targeted to that U.S. audience. That is foreseeable economic harm in the forum. The dollar amounts may or may not be relatively small compared to the destruction of value in *Mavrix*. Certainly the parties disagree and attack each others' methodologies. And both parties' methodologies are imperfect because they are based on extrapolations from data, sampling, or other proxies for damages. That said, the revenues that Goes estimates are not inconsequential, and there is missing data for the first six months after release of *Puzzle Bubble Free!* At this stage, the court resolves disputes about the damages in favor of Goes and concludes that it made a prima facie showing that the infringing conduct caused a jurisdictionally significant amount of harm in the United States.

**C. The Individual Defendants**

Dodur argues that the "fiduciary shield" doctrine prevents personal jurisdiction over the individual defendants Li Zhe and Zhou Ming. (Motion, ECF No. 34 at 23.) Goes responds that they were shareholders, the game developers, and the persons who necessarily uploaded the games through their individual developer accounts, filled out the agreements, selected the countries for distribution, and caused the distribution of the infringing games. (*See* Statement, *supra*.)

Under the fiduciary-shield doctrine, "a person's mere association with a corporation that causes injury in the forum state is not sufficient in itself to permit that forum to assert jurisdiction over the person." *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 520 (9th Cir. 1989). The employee's contacts must give rise to some identifiable theory of liability such that the employee's contacts on behalf of the corporate employer may justifiably be imputed to the employee. *Matsunoki Grp., Inc. v. Timberwork Oregon, Inc.*, No. C 08-040780 CW, 2009 WL 1033818, at *3 (N.D. Cal. April 16, 2009) (citation omitted). The requirement is fulfilled if "a plaintiff shows that a corporate employee is the moving, active, conscious force behind the infringing activity" by, for example, demonstrating that the employee "directs, controls, ratifies, or participates in the infringing activity" or "acts as the guiding spirit and the active directing hand in full charge of [the corporation's] operations." *Id.* at *3-*4 (quoting *International Mfg. Co. v. Landon, Inc.*, 336 F.2d 723, 728 (9th Cir. 1964)).

As discussed at oral argument, Goes's allegations about the employees' roles were based on

United States District Court

For the Northern District of California

1  "information and belief" and inferences. Dodur, in response, put forth uncontroverted evidence that

2  the employees did not act independently and acted instead at the corporation's behest. The court

3  concludes that Goes did not show that the employees were the moving force behind the infringing

4  activity and thus did not make a prima facie showing of personal jurisdiction.

## II. ARISING OUT OF FORUM-RELATED ACTIVITIES

6      For a claim to arise out of or relate to a defendant's forum-related activities, it must be a result of

7  but-for causation: but for the defendant's acts, a plaintiff is not injured. *See Ballard v. Savage*, 65 F.3d

8  1495, 1500 (9th Cir. 1995). The court concludes that the distribution of the application via the U.S.

9  platforms satisfies this test. *See Live Career*, 2015 WL 1448505, at *5; *Zherebko*, 2013 WL 4407485,

10  at *4.

## III. REASONABLENESS

12      This prong of the test for specific jurisdiction provides that the exercise of jurisdiction must

13  comport with fair play and substantial justice. *Panavision*, 141 F.3d at 1322. Similarly, the Fifth

14  Amendment's Due Process Clause bars the exercise of personal jurisdiction in a forum so

15  inconvenient as to deny a defendant "fair play and substantial justice." *See* 4A Charles A. Wright and

16  Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1068.1 (3d. ed. 2002); Cal. Prac. Guide: Fed. Civ. P.

17  before Trial § 3:33.11 (The Rutter Guide 2015) (citing *Central States, Southeast & Southwest Areas*

18  *Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 945 (7th Cir. 2000)).

19      To determine whether jurisdiction over a non-resident defendant comports with fair play and

20  substantial justice, a court considers seven factors: (1) the extent of the defendant's purposeful

21  interjection into the forum's affairs; (2) the burden on the defendant of defending in the forum; (3) the

22  extent of conflict with the sovereignty of the defendant's state; (4) the forum's interest in adjudicating

23  the dispute; (5) the most efficient judicial resolution of the controversy, (6) the importance of the

24  forum to the plaintiff's interest in convenient and effective relief, and (7) the existence of an

25  alternative forum. *Core-vent Corp. v. Nobel Indus.*, 11 F.3d 1482, 1487-88 (9th Cir. 1993). There is a

26  presumption of reasonableness when the first two prongs have been met, and a defendant thereafter

27  must present a "compelling case" that jurisdiction is unreasonable. *Schwarzenegger*, 374 F.3d at 802.

28      First, the "extent of the purposeful injection" is analogous to the purposeful direction analysis. *See*

**United States District Court**
For the Northern District of California

ORDER (No. 3:14-cv-5666-LB)                    20

United States District Court

For the Northern District of California

1 | *Sinatra v. National Enquirer, Inc.*, 854 F.2d 1191, 1195 (9th Cir. 1988); *Zherebko*, 2013 WL

2 | 4407485, at *4. The court finds that this element supports jurisdiction based on its analysis finding

3 | purposeful direction. Second, the burden on the foreign defendants militates against jurisdiction. *See*

4 | *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1115 (9th Cir. 2002). Third, the court disagrees with the

5 | defendants that a conflict with the sovereignty of China weighs against jurisdiction. Fourth, the forum

6 | has an interest in providing redress for copyright holders who do business here. Fifth, this may be the

7 | only forum for Goes, which addresses factors 5, 6, and 7.

8 | In sum, the court concludes that Dodur has not presented a compelling case that jurisdiction is

9 | unreasonable. *See Schwarzenegger*, 374 F.3d at 802. The forum is not so inconvenient that it denies

10 | Dodur "fair play and substantial justice": after all, it purposefully injected itself into the forum by

11 | distributing its products to U.S. consumers via an online platform.

12 | * * *

13 | The court makes these final observations. If it had been able to conclude that distribution in the

14 | United States was truly incidental or accidental, the result would be different. And if the record

15 | established the revenue streams more definitively as jurisdictionally insignificant, the result might be

16 | different too. But given the resolution of disputed facts in favor of Goes, *see Schwarzenegger*, 374

17 | F.3d at 800, and on this record, Goes has made a prima facie showing of specific personal jurisdiction

18 | over Dodur based on Dodur's contacts with the United States. *See* Fed. R. Civ. P. 4(k)(2).

19 | **CONCLUSION**

20 | The court grants the motion to dismiss the individual defendants for lack of personal jurisdiction

21 | and denies the motion to dismiss Dodur. This disposes of ECF No. 34.

22 | **IT IS SO ORDERED**.

23 | Dated: August 26, 2015

24 | LAUREL BEELER
United States Magistrate Judge

25 |

26 |

27 |

28 |