United States District Court
Northern District of California

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

San Francisco Division

11    GOES INTERNATIONAL, AB,                    Case No. 14-cv-05666-LB

12              Plaintiff,

13        v.                                      **ORDER GRANTING MOTION FOR DEFAULT JUDGMENT**

14    DODUR LTD.,                                 Re: ECF No. 138

15              Defendants.

16

17                              **INTRODUCTION**

18        Goes International is a Swedish company that created, copyrighted, and distributed a bubble-

19    shooting video game called *Bubble Bust!*[1] It sued Dodur Ltd. for one count of copyright

20    infringement, alleging that Dodur copied *Bubble Bust!* and marketed "virtually identical"

21    infringing games called *Puzzle Bubble Free!* and *Puzzle Bubble Sea*.[2] Dodur defended the case

22    initially and later did not. The court ultimately struck Dodur's answer (after issuing orders to show

23    cause and imposing intermediate sanctions). The clerk entered Dodur's default, and Goes moved

24    for default judgment. The court grants the motion.

25

26    ───────────────

      [1] First Amend. Compl. ("FAC") – ECF No. 27 at 2, 5–8, 29. Citations refer to material in the
27    Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of
      documents.

28    [2] *Id.* at 2–5 (¶¶ 1, 3, 12–15).

## 1. Procedural History

Goes sued Dodur and its shareholders/game developers for one count of copyright infringement, claiming that they copied *Bubble Bust!* and marketed infringing games called *Puzzle Bubble Free!* and *Puzzle Bubble Sea*.[3] The parties consented to magistrate-judge jurisdiction.[4]

Dodur moved to dismiss the complaint for lack of personal jurisdiction.[5] At oral argument on the motion to dismiss for lack of personal jurisdiction, Goes represented that the downloads in the U.S. and worldwide (and presumably Dodur's revenue) could be ascertained via third-party subpoenas.[6] Dodur agreed to a stipulated judgment to give Goes a formal mechanism to take down the infringing games.[7]

The court granted the motion in part, dismissing the individual defendants but finding personal jurisdiction against Dodur based on its distribution of games in the U.S., resulting in revenues generated from U.S. players, including from ads targeted to that U.S. audience.[8] Dodur then answered the complaint.[9]

Goes moved to compel discovery about Dodur's revenues from distributing the challenged software outside of the United States.[10] On February 4, 2016, the court ordered the discovery, finding that the discovery was relevant to the plaintiff's claims and proportional to the needs of the case.[11] The court did not decide whether the plaintiff could recover damages for downloads outside the U.S. because the fact record was undeveloped.[12]

---

[3] *Id.*

[4] ECF Nos. 8, 22.

[5] Mot. – ECF No. 34.

[6] Order – ECF No. 51 at 7.

[7] *Id.* at 7.

[8] *Id.* at 19.

[9] Answer – ECF No. 52.

[10] Letter Brief – ECF No. 69.

[11] Order – ECF No. 84 at 2.

[12] *Id.* at 1.

On February 10, 2016, Dodur's counsel moved to withdraw, citing Dodur's nonpayment of fees; the court granted the unopposed motion and directed counsel to continue to serve Dodur.[13] At the February 18 hearing on the motion, the court postponed damages discovery, referred the matter for a settlement conference with a magistrate judge, and asked Dodur's prior counsel whether it might represent Dodur through the settlement conference.[14] Ultimately, Dodur's counsel did not agree, and the parties never had a settlement conference.[15]

In December 2016, Goes moved to compel Dodur to name a Rule 30(b)(6) deponent, appear at a Rule 30(b)(6) deposition, and produce documents.[16] Dodur did not respond.[17] On January 12, 2017, the court held a hearing, granted Goes' motion to compel, ordered the Rule 30(b)(6) deposition for February 20, ordered production of documents by February 6, and issued an order to show cause directing Dodur to name new counsel by February 6, 2017.[18] Dodur did not name new counsel or appear at February 16, 2017 hearing.[19] The court allowed Goes to cancel the Rule 30(b)(6) deposition; it was set in New York, the location of Dodur's parent company Qihoo 360.[20]

The court set a further hearing for March 9, 2017 and ordered Dodur to show cause why it had not named new counsel or produced the court-ordered discovery.[21] The court warned Dodur that if it did not, it risked Goes' moving to strike Dodur's answer and seeking default judgment against Dodur.[22] Dodur did not appear at the March 9 hearing.[23]

---

[13] Mot. to Withdraw – ECF No. 85; Order – ECF No. 89. The court also directed Goes to serve Dodur on occasion but required both counsel to continue to serve Dodur and to file proofs of service. *See, e.g.*, Order – ECF No. 116 at 2.

[1414] Order – ECF No. 89 at 3–4.

[15] ECF No. 97.

[16] Mot. – ECF No. 104.

[17] Order – ECF No. 109 at 1.

[18] *Id.* at 1–2, 4.

[19] Order – ECF No. 128 at 2.

[20] *Id.* at 2.

[21] Order – ECF No. 116.

[22] *Id.* at 2.

[23] Minute Order – ECF No. 119.

Goes then moved for strike Dodur's answer and for terminating sanctions.[24] On June 9, 2017, the court struck Dodur's answer in an order that set forth the legal standard for sanctions (including terminating sanctions) and found that Goes satisfied its "heavy burden to establish the appropriateness of terminating sanctions. The undersigned warned Dodur repeatedly about the consequences of not participating in the litigation, set forth the chronology of its behavior and refusal to participate in the litigation, and gave it repeated opportunities to become active in this lawsuit."[25] The court also awarded $7,245 (Goes' lodestar fees in litigating the failure to provide discovery) against Dodur for discovery abuses.[26] At the court's direction, the Clerk of Court entered default against Dodur.[27]

Goes moved for default judgment and served Dodur.[28] Dodur did not respond to the motion or appear at the May 16, 2018 hearing.

## 2. Claim for Copyright Infringement

The following is a summary of the complaint's allegations about Dodur's alleged copying of Goes' copyrighted game *Bubble Bust!*.

Goes created and published its original video game *Bubble Bust!* around January 5, 2011.[29] It published the game through the Google Play online store and the Apple App Store.[30] On April 23, 2013, Goes registered a copyright on the game with the United States Copyright Office,[31] and on December 13, 2013, it registered a copyright on an updated version of the game.[32]

---

[24] Mot. – ECF No. 121.

[25] Order – ECF No. 128 at 1–7.

[26] *Id.* at 7.

[27] Entry of Default – ECF No. 129.

[28] Mot. – ECF No. 138; Lesowitz Decl. – ECF No. 138-2 at 2 (¶ 4).

[29] FAC – ECF No. 27 at 3 (¶ 5).

[30] *Id.* at 4 (¶¶ 9–10).

[31] *Id.* at 37–38.

[32] *Id.* at 40–41.

Dodur allegedly accessed (and copied) *Bubble Bust!* via the Apple App Store and, by January 2012, uploaded an infringing game called *Puzzle Bubble Free!* to the Apple App Store and "various other websites."[33] The complaint details Dodur's alleged infringement and updates of its games.[34] Dodur did not dispute its distribution but said that it created the games from scratch.[35]

The complaint specifies how Dodur copied coding that was not accessible to players.[36] It details the games' similarities and Dodur's updating its games whenever Goes added new features.[37] It sets forth Dodur's admission that it copied Goes' game: on February 4, 2015, Li Zhe (Dodur's principal) admitted that Dodur's former product manager for *Puzzle Bubble Free!* and *Puzzle Bubble Sea* copied *Bubble Bust!* to "'cut his own work load.'"[38]

### 3. Downloads and Revenues

Dodur's games were free downloads.[39] Revenue is from advertising and in-game (or in-app) purchases.[40]

### 3.1 Downloads

Dodur distributed its games through the Apple App store to consumers in the United States and elsewhere.[41] It affirmatively chose to distribute games to users in the United States.[42] In March 2013, it chose to make *Puzzle Bubble Sea* available to people in the United States but not

---

[33] *Id.* at 4 (¶ 12). Before Dodur defaulted, the parties did not dispute that Dodur uploaded the games to the Apple platform from China and that Dodur's employees lived in China and never traveled to the United States. *See* Order – ECF No. 51 at 4, 8 (citing Wang Decl. – ECF No. 34-1 at 13 (¶ 34)).

[34] *See* Order – ECF No. 51 at 3–4.

[35] *Id.* at 3.

[36] FAC – ECF No. 27 at 10 (¶¶ 33–34).

[37] *Id.* at 10–27 (¶¶ 35–52).

[38] *Id.* at 8 (¶ 21).

[39] Order – ECF No. 51 at 4.

[40] *Id.*

[41] FAC – ECF No. 27 at 27–28 (¶ 54).

[42] *Id.* at 29 (¶ 58).

China; it made the game available to players in China in August 2013.[43] In its opposition to Dodur's motion to dismiss for lack of personal jurisdiction, Goes specified that Dodur uploaded *Puzzle Bubble Sea* in March 2013 for distribution to all countries except China.[44] After Goes complained to Apple, Apple removed the games from the App Store in November 2013; Goes alleged that the game remained accessible on other sites.[45] Dodur uploaded a new (and allegedly infringing) version in November 2014 and limited distribution to Asia.[46]

In its complaint, Goes alleged on information and belief that users downloaded Dodur's challenged games at least 15 million times before Apple removed them and that Dodur "distributed at least 150,000 copies of *Puzzle Bubble Free!* and 3,000 copies of *Puzzle Bubble Sea* to users in the United States via the Apple App Store."[47] Goes elaborates:

> On or about May 15, 2015, DODUR LTD. filed incomplete data in this case regarding the number of downloads of Defendants' Games. Even according to this incomplete data from Yahoo!'s Flurry service, it turns out that Defendants' Games were downloaded more in the United States and worldwide than PLAINTIFF initially estimated. For example, the Flurry data indicates that *Puzzle Bubble Free!* was downloaded at least 49,477 times in the United States from the Apple App Store [starting in June 2012, six months after release]; this represents merely a minimum. However, the Flurry data does not include any data for downloads during the first six months or so that *Puzzle Bubble Free!* was available for distribution on the App Store. According to App Annie, a reliable third-party provider of data on application downloads that is trusted in the industry, *Puzzle Bubble Free!* had a popularity ranking in the United States on the App Store that was higher during the first six months of its release than during the period thereafter. (App Annie provides reliable rankings of applications by downloads in a genre, but does not provide the exact number of downloads of an application.) Also, applications tend to be most popular during the time after initial release. Also, it is unclear how the Flurry data was obtained: depending on how the data was obtained, it could have not included all U.S. downloads even for the period that Flurry tracked. California accounts for approximately 12.2-percent of the population of the United States.[48]

Goes extrapolates from this to reach its total of at least 150,000 U.S. downloads:

> It is undisputed that over 50,000 people in the U.S. downloaded Defendants' Games starting in June of 2012, which was six months after *Puzzle Bubble Free!*

---

[43] *Id.* at 30 (¶ 61).

[44] Order – ECF No. 51 at 4.

[45] *Id.*

[46] *Id.*

[47] FAC – ECF No. 27 at 26 (¶ 55).

[48] *Id.* at 26 (¶ 55 & n.3).

was released (Defendants provided no data for the first six months). Accounting for the hard evidence that downloads were higher in the U.S. during the first three months of distribution, and the unreliability of Defendants' data, total distribution is estimated to be over 150,000.[49]

Dodur game developer and shareholder Wang Li Ming declared that from June 19, 2012 to May 15, 2015, users in the United States downloaded 49,477 copies of *Puzzle Bubble Free!*, and from March 6, 2013 to May 15, 2015, users in the United States downloaded 2,256 copies of *Puzzle Bubble Sea*.[50] Worldwide during the same time periods, users downloaded 13,077,797 copies of *Puzzle Bubble Free!* and 203,383 copies of *Puzzle Bubble Sea*.[51]

**3.2 Revenues**

Dodur's revenues from the games are from advertising and in-game (or in-app) purchases.[52] The complaint alleges:

> *Puzzle Bubble Free!* and *Puzzle Bubble Sea* both contain advertisements which operate through Google Inc.'s AdMob and, on information and belief, Apple Inc's iAd, and Yahoo! Inc.'s Flurry. DEFENDANTS thereby receive revenue each time DEFENDANTS' games are played and thereby reap sizable profits through the infringement of PLAINTIFF's copyright. DEFENDANTS have reaped millions of dollars in profits through the infringement of PLAINTIFF's copyright.[53]

In its complaint, Goes alleged Dodur's revenues on "information and belief."[54] For *Puzzle Bubble Free!*, Dodur earned at least $35,000 in revenue in the United States: at least $27,000 in advertising revenues and at least $8,000 from in-game purchases.[55] For *Puzzle Bubble Sea*, Dodur earned at least $1,000 in revenue in the United States: at least $750 from advertising revenues and at least $250 from in-game purchases.[56] Both games had at least four in-game purchases at prices

---

[49] Mäkilä Decl. – ECF No. 37-1 at 13 (¶ 43); Ex. 13 – ECF No. 37-3 at 11.

[50] Wang Decl. – ECF No. 34-1 at 5 (¶¶ 15–18). Wang states that Dodur does not have access to any data about distribution of or revenue from the games before June 19, 2012. *Id.* at 5 (¶ 14).

[51] *Id.* at 5 (¶¶ 15–16). Goes adopts these numbers in its motion for default judgment. Mot. – ECF No. 138 at 13.

[52] *Id.*

[53] FAC – ECF No. 27 at 6 (¶ 23).

[54] *Id.* at 29 (¶ 57)

[55] *Id.*

[56] *Id.*

ranging from $0.99 to $3.99 through the Apple Store.[57]

In its declaration in support of its motion to dismiss, Dodur responded that Goes had no support for its figures, U.S. revenue was less than $2,200, and U.S. downloads were 0.39% of worldwide downloads.[58] In other words, 99.61% of *Puzzle Bubble Free!* and *Puzzle Bubble Sea* downloads occurred outside the U.S.[59] Again, worldwide downloads were (1) 13,077,797 downloads of *Bubble Free!* from June 19, 2012 to May 12, 2015, and (2) 203,383 downloads of *Bubble Sea* from March 6, 2013 (the date it became available) to May 12, 2015.[60] Dodur estimated that China downloads are 88% of worldwide user downloads: (1) 11,458,093 China downloads of *Puzzle Bubble Free!* from June 19, 2012 to May 12, 2015, and (2) 167,341 China downloads of *Puzzle Bubble Sea* from March 6, 2013 to May 12, 2015.[61] Dodur says that in-app purchases were available, but the total U.S. revenue for in-app purchases for all Dodur games was insignificant: $241.50 in 2012 and 2013.[62] No in-app purchases are attributable to *Puzzle Bubble Sea*. Its revenue comes from advertising.[63]

For advertising revenue from Google Admob for *Puzzle Bubble Free!* and *Puzzle Bubble Sea*, Dodur tracks only worldwide revenues (and not U.S. revenues).[64] Dodur's records show total worldwide revenue from the Google Admob platform for both games of $41,430.08 broken down as follows: (1) $41,116.37 for *Puzzle Bubble Free!* from January 8, 2012 to May 12, 2015 and (2) $313.71 for *Puzzle Bubble Sea* until May 12, 2015.[65] Dodur used Google Admob's tracking system (an industry norm) to identify worldwide and U.S. advertising revenue from August 13, 2014 to May 12, 2015 (apparently the available period) and identified total worldwide and U.S

---

[57] *Id.*

[58] Wang Decl., ECF No. 34-1 at 4 (¶ 13), 12 (¶ 32).

[59] *Id.* at 4 (¶ 13).

[60] *Id.* 5 (¶¶ 15–16).

[61] *Id.* at 6–7 (¶¶ 21–23).

[62] *Id.* at 7 (¶ 24).

[63] *Id.* at 7 (¶¶ 24–25).

[64] *Id.* at 4 (¶ 12).

[65] *Id.* at 8–9 (¶ 27).

advertising for *Puzzle Bubble Free!* ($206.60 and $1.84, respectively) and *Puzzle Bubble Sea*

($62.67 and $2.18, respectively).[66] This means that the percentage of U.S. revenue from Google

Admob for *Puzzle Bubble Free!* and *Puzzle Bubble Sea* is 1.49% for the sample period from

August 13, 2014 to May 12, 2015: ($1.84 + $2.18) ÷ ($206.60 + $62.67) = 1.49%.[67] Applying that

percentage to total worldwide revenue from Google Admob of $41,430.08 (from January 8, 2012

to May 12, 2015) yields estimated U.S. revenue of $617.31.[68] Dodur projected that by the third

quarter of 2015, ad revenues from Google Admob would cease because Google Admob regularly

updates the software development kit that it injects into the code of games to generate ads, older

software development kits become non-operational, and *Puzzle Bubble Free!* and *Puzzle Bubble

Sea* are not offered on the App store. That means that when Google Admob next updated its

software development kit, downloaded versions of *Puzzle Bubble Free!* and *Puzzle Bubble Sea*

stopped generating ad revenue.[69]

Advertising revenue from Apple iAd for *Puzzle Bubble Free!* and *Puzzle Bubble Sea* occurred

from January 8, 2012 (the date *Puzzle Bubble Free!* was published) through November 23, 2013

(the date Apple removed the challenged games from the Apple App store).[70] The iTunes iConnect

store no longer makes available the revenues for the games from the United States but it shows the

revenues for the "Americas" region of $14,562.29 for all Dodur games during the time *Puzzle

Bubble Free!* was distributed (along with 13 other Dodur games) and $275.09 for all Dodur games

during the time *Puzzle Bubble Sea* was distributed (along with three other Dodur games).[71] From

those numbers, in this time period, and based on the days *Puzzle Bubble Free!* and *Puzzle Bubble

Sea* were available for download, Dodur estimates total "Americas" iAd revenues attributable to

---

[66] *Id.* at 9 (¶ 28).

[67] *Id.*

[68] *Id.* at 10 (¶ 29).

[69] *Id.* at 9 (¶ 27(b)), 10 (¶ 30).

[70] *Id.* at 11–12 (¶ 31).

[71] *Id.*

*Puzzle Bubble Free!* of $1,396.68 and to *Puzzle Bubble Free* of $68.77 for a total of $1,465.45.[72]

At the motion-to-dismiss phase, Goes objected to Dodur's discrepancies in calculations and reliability.[73] Goes' CEO opines (from experience working on applications that generate ad revenue and from his review of industry data from trusted and reliable sources) that it is unreasonable for an application that generates revenue from providers such as Admob to generate less than $100,000 from an application that received 13 million downloads.[74] His review of the Wang Declaration shows 897 million playing sessions from roughly 13 million new users (an average of 69 sessions per user with a median length of 4.5 minutes).[75] That means 310 minutes per average user (69 sessions x 4.5 minutes).[76] Based on playing the game and his experience in the industry, it is reasonable to assume that the game displays two ads per minute.[77] That is 310 minutes x 2 ads per minute = 620 ads per user, which (based on the Admob 92% fill rate in the Wang Declaration) results in $1.04 million in total advertising revenue (based on average ad revenue of 14 cents per 1,000 ad views = $.08 per user x 13 million = $1.04 million).[78] With 52,000 U.S. users, that should be (even according to the "underreported data" from the Wang declaration) $8,320 (52,000 users x $.16).[79] He analyzes metrics and concludes that revenue should be higher in the first five months of the game's release (where Dodur omitted – or does not have – data.)[80] He also asserts that Mr. Wang cannot extrapolate from Apple iAd data the revenues attributable to in-app purchases.[81]

In his declaration in support of Goes' motion for default judgment, Goes' CEO reiterated this

---

[72] *Id.*

[73] Opp. – ECF No. 37 at 11–12 (citing Mäkilä Decl., ECF No. 37-1 at 4–5 (¶ 12), 12–14 (¶¶ 39–45); Objections – ECF No. 42.

[74] Mäkilä Decl., ECF No. 37-1 at 12 (¶ 39).

[75] *Id.* at 12 (¶ 40).

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.* at 13 (¶ 41).

[80] *Id.* at 13 (¶¶ 42–44).

[81] *Id.* at 14 (¶ 45).

analysis and adds that "Apple has now informed us that there were over 2.8 million downloads of *Puzzle Bubble Free!* from January through May 2012. This would increase the revenue estimate by 2,800,000 users x $.08 ad revenue per user, which equals $224 additional dollars. Thus, the revised estimate of total revenue is $1,264,000."[82]

### 3.3 Statutory Damages Are Not Available

Because Goes did not register *Bubble Bust!* within three months of publication, there are no statutory fees or damages under 17 U.S.C. § 412(2).[83] *See* 17 U.S.C. § 412(2) (no award of statutory damages or attorney's fees after "first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work"). Goes admits that *Puzzle Bubble Free!* and *Puzzle Bubble Sea* are "virtually the same game. . . ."[84] As a result, statutory damages and attorney's fees are not recoverable for *Puzzle Bubble Sea* either. *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 700–01 (9th Cir. 2008).

## ANALYSIS[85]

### 1. Jurisdiction and Service

Before entering default judgment, a court must determine whether it has subject-matter jurisdiction over the action and personal jurisdiction over the defendant. *See In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999). And a court must ensure the adequacy of service on the defendant. *See Timbuktu Educ. v. Alkaraween Islamic Bookstore*, No. C 06–03025 JSW, 2007 WL 1544790, at *2 (N.D. Cal. May 25, 2007). First, the court has subject-matter jurisdiction because Goes'

---

[82] Mäkilä Decl., ECF No. 138-1 at 3–4 (¶ 13). The court previously overruled both parties' objections to each other's declarations, albeit in the context of a motion to dismiss for lack of personal jurisdiction. Order – ECF No. 51 at 7. The issue there was whether Goes had met its burden of establishing jurisdiction. *Id.* at 9. "'[T]he court "may consider evidence presented in affidavits to assist in its determination'" about whether the plaintiff met its burden to establish personal jurisdiction. *Id.* (quoting *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001)).

[83] *Id.*

[84] FAC – ECF No. 27 at 5.

[85] The court incorporates the analysis in its earlier orders at ECF Nos. 51 and 84 by this reference.

United States District Court
Northern District of California

copyright infringement claims invoke federal-question jurisdiction. *See* 28 U.S.C. § 1331. Second, the court has personal jurisdiction over Dodur for the reasons discussed in the court's earlier order (incorporated by this reference) denying Dodur's motion to dismiss.[86] Third, Goes served Dodur through Dodur's counsel; Dodur thereafter appeared and defended the action.[87] After Dodur's counsel withdrew, Dodur was served with all relevant motions and court orders.[88]

### 2. Default Judgment

Under Federal Rule of Civil Procedure 55(b)(2), a plaintiff may apply to the district court for — and the court may grant — a default judgment against a defendant who has failed to plead or otherwise defend an action. *See Draper v. Coombs*, 792 F.2d 915, 925 (9th Cir. 1986). After entry of default, well-pleaded allegations in the complaint regarding liability and entry of default are taken as true, except as to damages. *See Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002); *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987). The court need not make detailed findings of fact. *Combs*, 285 F.3d at 906. Default judgment cannot differ in kind from or exceed the amount demanded in the pleadings. Fed. R. Civ. P. 54(c).

"A defendant's default does not automatically entitle the plaintiff to a court-ordered judgment," *Pepsico, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1174 (C.D. Cal. 2002); that decision lies within the court's discretion, *Draper*, 792 F.2d at 924–25. Default judgments generally are disfavored because "[c]ases should be decided upon their merits whenever reasonably possible." *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986). In deciding whether to enter a default judgment, the court considers: "(1) the possibility of prejudice to the plaintiff; (2) the merits of [the] plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether

---

[86] *See* Order – ECF No. 51.

[87] Affidavit – ECF No. 33.

[88] *See, e.g.*, Proofs of Service – ECF Nos. 107, 113, 117, 118, 122, 138-3.

United States District Court
Northern District of California

the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." *Id.* at 1471–72.

### 2.1 Possibility of Prejudice to the Plaintiff (First *Eitel* Factor)

The first *Eitel* factor considers whether the plaintiff would suffer prejudice if default judgment is not entered, and whether such potential prejudice to the plaintiff weighs in favor of granting a default judgment. *Eitel*, 782 F.2d at 1471; *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1054 (N.D. Cal. 2010). This factor weighs in favor of default judgment. Dodur defended the lawsuit initially but then refused to produce discovery, substitute counsel, or defend the case, despite the court's issuance of orders to show cause, warnings about terminating sanctions, and imposition of intermediate sanctions for the discovery violations. Goes has no recourse against Dodur except for default judgment.

### 2.2 Merits and Sufficiency of the Claims (Second and Third *Eitel* Factors)

The second and third *Eitel* factors consider the merits of the claim and the sufficiency of the complaint. *Eitel*, 782 F.2d at 1471. "The Ninth Circuit has suggested that [these factors] . . . require that plaintiffs' allegations 'state a claim on which the [plaintiff] may recover.'" *Kloepping v. Fireman's Fund*, No. C 94-2684 TEH, 1996 WL 75314, at *2 (N.D. Cal. Feb. 13, 1996) (citing *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978)).

Goes asserts one claim against Dodur for copyright infringement in violation of 17 U.S.C. §§ 501, 106 *et seq*. The elements of copyright infringement are "(1) ownership of a valid copyright; and (2) [] the defendant violated the copyright owner's exclusive rights under the Copyright Act." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004) (citing, inter alia, 17 U.S.C. § 501(a)). Rights under the Copyright Act include the right to reproduce the copyrighted work, to prepare derivative works based upon the copyrighted work, to distribute copies of the work and to display the copyrighted work publicly. 17 U.S.C. § 106.

Taking Goes' allegations as true on Dodur's default, Goes states a claim for copyright infringement. Goes owns copyrights to *Bubble Bust!*.[89] A registration certificate is prima facie

---

[89] FAC – ECF No. 27 at 3 (¶¶ 5, 7–8), 32 (¶ 70).

evidence of a valid copyright and shifts the burden to the opposing party to prove the invalidity of the copyright. *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1217 (9th Cir. 1997). Moreover, Goes plausibly claimed Dodur's copyright infringement in the complaint. The relevant allegations are summarized in the Statement and specified in detail in the court's order denying Dodur's motion to dismiss for lack of personal jurisdiction.[90]

### 2.3 Sum of Money at Stake (Fourth *Eitel* Factor)

The fourth *Eitel* factor addresses the amount of money at stake in the litigation. *Eitel*, 782 F.2d at 1471. When the money is substantial or unreasonable, default judgment is discouraged. *See id.* at 1472 (three-million dollar judgment, considered in light of parties' dispute as to material facts, supported decision not to enter default judgment); *Tragni v. S. Elec. Inc.*, No. 09-32 JF (RS), 2009 WL 3052635, at *5 (N.D. Cal. Sept. 22, 2009); *Bd. of Trustees v. RBS Washington Blvd, LLC*, No. C 09-00660 WHA, 2010 WL 145097, at *3 (N.D. Cal. Jan. 8, 2010). When the sum of money at stake is tailored to the specific misconduct of the defendant, default judgment may be appropriate. *See Bd. of Trs. of the Sheet Metal Workers Health Care Plan of N. Cal. v. Superhall Mech., Inc.*, No. C-10-2212 EMC, 2011 WL 2600898, at *2–*3 (N.D. Cal. June 20, 2011) (the amount of unpaid contributions, liquidated damages, and attorney's fees were appropriate as they were supported by adequate evidence provided by the plaintiffs).

Section 504(b) of the Copyright Act provides that a "copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). Goes seeks $1,264,000 in damages based on its estimate of the advertising revenues that Dodur received from the infringing games.[91] It also seeks the $7,245 that the court imposed for discovery violations.[92]

---

[90] Order – ECF No. 51 at 2–4.

[91] Mot. – ECF No. 138 at 2.

[92] *Id.*

The court addresses damages in section 3 and finds that damages in the form of Dodur's profits from U.S. downloads is tailored to Dodur's misconduct.

### 2.4 Possibility of a Factual Dispute or Excusable Neglect (Fifth and Sixth *Eitel* Factors)

The fifth and sixth *Eitel* factors consider the potential of factual disputes and whether a defendant's failure to respond was likely due to excusable neglect. *Eitel*, 782 F.2d at 1471–72. In *Eitel*, there was a factual dispute and excusable neglect. *Id.* at 1472. The *Eitel* defendant disputed material facts in the (untimely) answer and counterclaim. *Id*. But the defendant's response was late because the parties had previously agreed to "what appeared to be a final settlement agreement," and "[the defendant] reasonably believed that the litigation was at an end[.]" *Id.* Because his reliance was reasonable, and he promptly responded when the agreement dissolved, the court found excusable neglect for the defendant's untimely response. *Id.*

The procedural history in the Statement shows that there is no excusable neglect here. Dodur has not defended the case.[93] As discussed in the damages section, there are fact disputes about U.S. and non-U.S. ad revenues.

### 2.5 Policy Favoring a Decision on the Merits (Seventh *Eitel* Factor)

The seventh *Eitel* factor requires considering the strong policy favoring decisions on the merits. *Eitel*, 782 F.2d at 1472; *see also Pena v. Seguros La Comercial, S.A.*, 770 F.2d 811, 814 (9th Cir. 1985). Although default judgment is disfavored, "[t]he very fact that F.R.C.P. 55(b) exists shows that this preference, standing alone, is not dispositive." *Kloepping*, 1996 WL 75314 at *3. "While the Federal Rules do favor decisions on the merits, they also frequently permit termination of cases before the court reaches the merits[,] . . . [as] when a party fails to defend against an action[.]" *Id.*

Dodur has not defended the lawsuit since the court ruled against it on the discovery dispute regarding the scope of damages. Litigation on the merits is not possible.

*        *        *

---

[93] *See supra*, Statement.

In sum, the *Eitel* factors weigh in favor of granting default judgment. In the next section, the court considers the scope of relief.

### 3. Relief Sought

The Copyright Act provides that a "copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). Goes seeks $1,264,000 in damages based on its estimate of the advertising revenues that Dodur received from the infringing games. [94] It also seeks the $7,245 that the court imposed for discovery violations. [95]

In assessing the *Eitel* factors, all factual allegations in the complaint are taken as true, except allegations regarding damages. *TeleVideo Sys.*, 826 F.2d at 917–18. "To recover damages after securing a default judgment, a plaintiff must prove the relief it seeks through testimony or written affidavit." *Bd. of Trs. of the Laborers Health & Welfare Trust Fund for N. Cal. v. A & B Bldg. Maint. Co. Inc.*, No. C 13-00731 WHA, 2013 WL 5693728, at *4 (N.D. Cal. Oct. 17, 2013); *Cannon v. City of Petaluma*, No. C 11-0651 PJH, 2011 WL 3267714, at *2 (N.D. Cal. July 29, 2011) ("In order to 'prove up' damages, a plaintiff is generally required to provide admissible evidence (including witness testimony) supporting damage calculations."); *see also Bd. of Trs. of Bay Area Roofers Health & Welfare Trust Fund v. Westech Roofing*, 42 F. Supp. 3d 1220, 1232 n.13 (N.D. Cal. 2014) ("It is Plaintiffs' burden on default judgment to establish the amount of their damages.").

In addition, under Federal Rule of Civil Procedure 54(c), "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). The purpose of this rule is to ensure that a defendant is put on notice of the damages being sought against him so that he may make a calculated decision as to whether or not it is in his best interest

---

[94] Mot. – ECF No. 138 at 2.

[95] *Id.*

to answer. *See In re Ferrell,* 539 F.3d 1186, 1192–93 (9th Cir. 2008); *Bd. of Trs. of the Sheet Metal Workers Local 104 Health Care Plan v. Total Air Balance Co., Inc.*, No. 08-2038 SC, 2009 WL 1704677, at *4 (N.D. Cal. June 17, 2009).

Goes seeks damages in the form of Dodur's revenues for the worldwide distribution of its challenged games *Puzzle Bubble Free!* and *Puzzle Bubble Sea.* There are two issues: entitlement to damages and proof of damages.

### 3.1 Entitlement to Damages: Worldwide Distribution or U.S. Distribution Only

The first issue is whether Goes may recover damages for worldwide downloads of the challenged games or instead may recover damages only for games downloaded in the U.S.

Before Dodur's default, the parties did not dispute that Goes is entitled to damages for games downloaded by U.S. players; the court recognized previously and holds now that Goes is entitled to those damages.[96] *See Shropshire v. Canning*, 809 F. Supp. 2d 1139, 1145 (N.D. Cal. Aug. 22, 2011).

The issue then is recovery of revenues attributable to downloads in countries other than the U.S. The parties did not dispute — and the Statement summarizes — that Dodur's employees were in China, uploaded the games to the Apple App store from China, and never visited the United States; it also was undisputed that the downloads in the U.S. were a small percent of worldwide distribution, and U.S. revenues were modest.[97] And ordinarily, acts of copyright infringement that occur outside of the jurisdiction of the United States are not actionable under the U.S. Copyright Act. *Impression Prods. v. Lexmark Int'l*, 137 S. Ct. 1523, 1537 (2017); *Yount v. Acuff Rose-Opryland*, 103 F.3d 830, 835 (9th Cir. 1996).

But Goes contends that when Dodur uploaded its infringing games to the Apple App Store, it necessarily put the games on Apple's servers, which all were located in the United States (and

---

[96] Order – ECF No. 51.

[97] *See supra* Statement; Order – ECF No. 51 at 1–9, 14, 16, 21 (reviewing allegations in FAC, including jurisdictional facts, and holding that Goes established a prima facie showing of specific personal jurisdiction over Dodur based on Dodur's contacts with the United States in the form of its distribution of games to U.S.-based players, resulting in roughly 50,000 undisputed downloads and (extrapolating from that number) possible 150,000 total downloads).

mostly in California) during the relevant time period.[98] According to Goes, it is that act — the equivalent (it says) of copying the program and shipping it abroad — that subjects Dodur to liability for the worldwide downloads.[99] It does not ask for damages derived from purely foreign downloads where no U.S. "companies or sources were utilized in connection to monetization."[100] As an example of an excluded foreign download, it specifies "a Chinese consumer downloading one of Dodur's game from the Chinese Baidu App Store that utilizes no third-party American services."[101]

No case has addressed whether uploading infringing games from abroad to a third-party host's U.S.-based servers creates copyright liability for subsequent downloads by users outside the U.S. when the uploaders and downloaders have no knowledge of the server locations. Citing *L.A. News Serv. v. Reuters Tel. Intern. Ltd.*, 149 F.3d 987, 990–92 (9th Cir. 1998), Goes argues that if the infringing act occurs in the United States, then the infringer is liable for extraterritorial damages.[102] *Reuters* does not compel a conclusion that Dodur is liable to Goes for profits from Dodur's extraterritorial distribution of the infringing games.

In *Reuters*, the plaintiff Los Angeles News Service produced two videos of the 1992 riots that followed the Rodney King verdict, copyrighted them, licensed them to NBC (which used them on the *Today* show), and otherwise retained ownership and the right to license them. 149 F.3d at 990. When NBC broadcast the show, it transmitted the show via fiber link to Visnews in New York,

---

[98] Mot. – ECF No. 138 at 13–14 (citing FAC – ECF No. 27 at 27–28 (¶ 54); Lesowitz Decl. – ECF No. 37-6 at 2 (¶ 2) & Exs. 1–2). Before Dodur's default, the parties did not dispute that Dodur uploaded its games through Apple's servers in the United States.

[99] Mot. – ECF No. 138 at 6, 13–14. Goes more broadly specifies its damages as "(1) all revenues derived from consumers — regardless of location — who downloaded Dodur's applications from the Apple App Store (or if applicable, another U.S.[-]based [] company such as Google) and, separately, (2) revenues that ran through American companies and services, especially domestic advertising companies." *Id.* at 13. But the only concrete downloads it specifies are those from the Apple App Store. *Id.* The court thus confines its analysis to whether Dodur is liable for worldwide damages for copyright infringement based on Dodur's uploading games from China to Apple's U.S.-based servers and non-U.S.-based consumers' subsequent downloads of the games from the U.S. servers.

[100] *Id.*

[101] *Id.*

[102] *Id.* at 18.

which transmitted a copy to subscribers in Europe and Africa. *Id.* It also transmitted copies of the videos to the New York office of the European Broadcasting Union ("EBU"), which in turn made a videotape copy and transmitted it via satellite to Reuters' London branch, which "provided copies to its subscribers." *Id.* The Ninth Circuit held a predicate act of direct infringement took place in the United States when Visnews and EBU copied the videos. *Id.* at 991–92. Reuters thus was liable for its international transmissions, "which were made possible by the infringing acts of copying in New York." *Id.* at 992.

*Reuters* is an easier case: making a copy of a videotape in the United States and then transmitting it abroad for distribution is different than a Chinese developer's upload to the third-party Apple servers and subsequent downloads by foreign consumers. It does not intuitively flow from *Reuters* that a third-party company's decision about where it hosts data drives copyright liability for an infringing party that operates wholly outside of the United States and distributes copies to non-U.S. consumers. Companies like Apple and Google make decisions about storing data often in aid of overall network optimization and can move data automatically. *See In the Matter of the Search of Content That is Stored at Premises Controlled by Google*, No. 16-mc-80263-LB, 2017 WL 1487625, at *1 (N.D. Cal. Apr. 25, 2017), *aff'd*, 2017 WL 3478809 (N.D. Cal. Aug. 14, 2017). Where a company stores its "1's and 0's" is not necessarily like the domestic physical copying of a videotape that allowed Reuters' foreign subsequent distribution. *See id.* at *4 (quotation omitted). Put another way, Dodur's use of third-party servers is not the volitional conduct that *Reuters* and other courts find to be a predicate act of direct infringement in the U.S.[103]

---

[103] Goes cites other cases to support its argument, but like *Reuters*, the cases involve physical predicate acts in the U.S. that differ qualitatively from the foreign upload and foreign downloads from third-party Apple's California servers. *Id.* at 18–19. In *Sheldon v. Metro-Goldwyn Pictures Corp.*, the defendants created a movie from the plaintiff's play, copied the negatives, and shipped them abroad for distribution. 106 F.2d 45, 52 (2nd Cir. 1939). That case — which found liability in the form of the defendants' profits from foreign screenings — involved an obvious act of domestic copying. *Id.*; *see Reuters*, 149 F.3d at 991–992 (following *Sheldon*). In *Tire Eng. & Distrib., LLC v. Shandong Linglong Rubber Co., Ltd.*, the foreign defendants stole the U.S. plaintiff's blueprints for specialized tires and used them to make and sell tires overseas. 682 F.3d 292, 298–99 (4th Cir. 2012). Like *Reuters* and *Sheldon*, the predicate act for the overseas distribution occurred in the U.S. *Id.* Similarly, *Update Art, Inc. v. Modiin Publ., Ltd.* involved the illegal reproduction of a poster in the United States and its subsequent export to Israel and publication in Israeli newspapers. 843 F.2d 67, 73 (2nd Cir. 1988).

As this court has held, the Copyright Act fairly captures foreign uploads targeted to and downloaded by U.S. consumers.[104] *See Shopshire*, 809 F. Supp. 2d at 1146 (video upload from Canada led to infringing copy on YouTube's California servers and the subsequent viewing by U.S. viewers); *see also Crunchyroll Inc. v. Tokyo Corp.*, No. C 11-2334-SBA, 2014 WL 1347492, at *17 (N.D. Cal. March 31, 2014) (following *Shropshire*). There is after all an act of domestic copyright infringement through downloads in the U.S. *Shropshire*, 809 F. Supp. 2d at 1145–46.

But on this record and argument, the court cannot conclude that a completed act of copyright infringement occurred from an alleged pass-through on a third-party's domestic servers. Dodur has not been to the U.S., and it allegedly downloaded Goes' games (to copy them) and uploaded its infringing games in China via the China-specific platform for Apple's App Store.[105] Goes cites only cases that involve concrete, predicate acts of infringement in the U.S. The pass-through use of third-party servers here is not analogous to those domestic copyright violations. And while downloads by U.S. users establish a completed act of copyright infringement, the court cannot conclude on the record here that there are completed acts for foreign users based only on an upload from China, the possible fortuitous pass-through use of a U.S. server, and the wholly extraterritorial downloads. *See Allarcom Pay Telev., Ltd. v. General Instr. Corp.*, 69 F.3d 381, 387 (9th Cir. 1995) (Showtime's broadcast of its signal with copyrighted material from the U.S. to Canada resulted in a completed infringement only in Canada once the user received the signal and viewed the content); 2 Nimmer on Copyright § 8.11[A] at 8-124.1. While an image stored on a computer or server is a "copy," *see Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160 (9th Cir. 2007), it (again) was the U.S. downloads in *Shopshire* (and in the court's prior order) that formed the copyright claim. There is a presumption against the extraterritorial application of U.S. copyright law. *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1094 (9th Cir. 1994).

---

[104] Order – ECF No. 51; *see supra*.

[105] Wang Decl. – ECF No. 34-1 at 10 (¶ 30), 13 (¶ 34), 16 (¶ 48); Wang Decl. – ECF No. 74-1 at 2 (¶ 4). A related issue is that while the complaint pleads that Dodur necessarily uploaded its infringing games to Apple's servers in California, the record does not establish — and Dodur disputed — that Dodur uploaded its infringing software to servers here. Letter Brief – ECF No. 74 at 7 (citing Apple's maintenance of data servers in the U.S. and elsewhere).

The court thus concludes that Goes has not established damages flowing from Dodur's extraterritorial exploitation of an infringing act that occurred in the United States. *Reuters*, 149 F.3d at 992.

The court previously found personal jurisdiction based on Dodur's U.S. forum activities, based not on Dodur's use of Apple's server but instead on its acts aimed at U.S. consumers.[106] A recent Ninth Circuit unpublished decision — which is not precedential under Ninth Circuit Rule 36.3(a) — supports that analysis.[107] *DEX Sys. Inc. v. Deusche Post AG*, No. 16-56044, 2018 WL 1280917, at *1–*2 (9th Cir. March 13, 2018). Like the damages cases analyzed in this section (all involving domestic predicate acts of copyright infringement), DEX involved purposeful acts in the U.S. forum.

In *DEX*, the Ninth Circuit considered personal jurisdiction over a Netherlands company-defendant called DSC that sent print requests from "outside the forum," meaning outside the United States, and ultimately printed the documents in the Netherlands by using the plaintiff DEX's California-hosted software to accomplish the printing. *Id.* at *1–*2. In *DEX*, "the record establishe[d] the following: (1) DEX's Camarillo, California server had to be engaged and used for the software to software at issue to function, and DSC had knowledge of this fact; (2) DSC sent print requests to DEX's California server causing the software to engage and create output data that was sent via the VPN to DSC's printers in Venlo, Netherlands; [and] (3) after the expiration of the license agreement, DSC continued to access DEX's California server to activate and use the software on the California server—allegedly committing an instance of intentional copyright infringement occurring on California servers. *Id.* at *2. The use of the server was not a "fortuitous occurrence." *Id.* at * 2 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980) (single automobile passing through the forum)). "Rather, the software was located on California servers pursuant to an agreement reached between the parties. DSC and DEX

---

[106] Order – ECF No. 51 at 9–21.

[107] The court does not rely on the case as precedent and instead cites it as persuasive support of its limitation of damages to those attributable to U.S. consumers, based on either lack of personal jurisdiction over Dodur's foreign distribution or Goes' failure to establish foreign exploitation of a domestic copyright infringement.

United States District Court
Northern District of California

actively set up the California-based VPN to facilitate printing following technical difficulties with a primary VPN based in Europe." *Id.* at *2. The parties agreed to route the data through DEX's server in California. *Id.*

The *DEX* parties' agreement — which contemplated the defendant's direct availing of DEX's California servers to facilitate printing in Netherlands — is different than using the Apple App store (even if Apple's servers are located in California) and supports the court's conclusion that damages are limited to domestic acts of copyright infringement.

First, DSC contracted to use DEX's services and knew the California server would be used to supplement the primary Europe-based VPN. It makes sense that it would be liable for its continued infringing use of the California-hosted software after its license with DEX expired. [108]

Second, *DEX* addressed DSC's purposeful direction of activities at the forum. *Id.* at *1. The Ninth Circuit understandably found that "DSC's allegedly infringing conduct was expressly aimed at and occurred in California—causing harm DSC knew DEX would suffer in California." *Id.* More succinctly, DSC's conduct was aimed at California and caused harm to DEX in California. By contrast, in finding personal jurisdiction over Dodur, the court did not rely on Dodur's (perhaps fortuitous and unaware) use of non-party Apple's California's servers. [109] Instead it found personal jurisdiction based on Dodur's actions "geared toward distribution of its allegedly infringing products to U.S. consumers via a U.S. commercial platform." [110] And under the "effects test," the court "'focuse[d] on the forum in which the defendant's actions were felt, whether or not actions themselves occurred within the forum.'" [111] The court did not rely on Goes' economic harm in other forums (such as its principal place of business in Sweden) and instead found that Dodur

---

[108] Unlike *DEX*, where DSC knew about and contemplated use of DEX's California's servers, Goes does not allege that Dodur knew where Apple hosted its data. *See* FAC – ECF No. 27 at 4 (¶ 12). Even if Dodur knew, it would not change the court's analysis. As discussed above, where data is hosted can be a decision driven by network efficiency. And in this case, the third-party host's server-location decision does not obviously result in harm in the forum.

[109] Order – ECF No. 51 at 14–19.

[110] *Id.* at 16–19.

[111] *Id.* at 17 (quoting *Mavrix Photo., Inc. v. Brand Techns., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011)).

purposefully derived benefit from its activities here, resulting in jurisdictionally significant harm in the U.S. in the form of U.S.-generated revenue.[112] Like *DEX*, harm here drives jurisdiction.[113]

### 3.2 Amount of Damages

Goes is entitled to damages only from U.S. downloads. But even if it had established damages flowing from an extraterritorial exploitation of an infringing act that occurred in the U.S., *see Reuters*, 149 F.3d at 992, it has not submitted admissible evidence supporting its damages calculations.

First, Goes seeks Dodur's profits as damages. Goes concedes that extraterritorial damages are limited to Dodur's profits.[114] 17 U.S.C. § 504(b); *L.A. News Serv. v. Reuters Telev. Int'l Ltd.*, 340 F.3d 926, 929–32 (9th Cir. 2003). But Goes estimates Dodur's revenues; that is not the same as profits. *Livingston v. Art.com, Inc.*, No. 13-cv-03748-JSC, 2015 WL 4319851, at *10 (N.D. Cal. Apr. 17, 2015).

Second, there can be a need to extrapolate when that need is a result of the defendant's failure to participate in the litigation. *Id.* But here, Goes relies on its CEO's experience working on applications that generate ad revenue and his review of general industry data. That speculation — even with the CEO's playing the infringing games and seeing displayed ads[115] — does not support Goes' claimed damages.

Third, as discussed in the Statement, Dodur's counsel provided revenue amounts that differed from Goes' speculative $1,264,000 in damages: worldwide revenue of $41,430.08 for Admob and revenue of $14,562.69 for iAd from the Americas.[116] This further supports the conclusion that Goes has not established its entitlement to damages in the amount it claims.

---

[112] *Id.* at 17–19.

[113] The court came close at the motion-to-dismiss stage to concluding that harm might be jurisdictionally insignificant but found — given the legal standard — that Goes had made a prima facie showing of specific personal jurisdiction over Dodur based on Dodur's commercial contacts with the U.S. *Id.* at 21.

[114] Mot. – ECF No. 138 at 18.

[115] Mäkilä Decl., ECF No. 138-1 at 2–4 (¶¶ 6–14). Goes' counsel emphasized this point at the May 16 hearing.

[116] *See supra*, Statement.

Fourth, Goes calculated U.S. revenue from Google Admob as at least $8,320. The court could use revenue as proxy for profits, especially when revenue is low, Dodur could deduct its expenses from worldwide revenue, and Dodur itself used approximations to reach its own estimate of $2,200.[117] And the parties generally did not dispute that the record establishes U.S. downloads of 49,477 copies of *Puzzle Bubble Free!* and 2,256 copies of *Puzzle Bubble Sea*.[118] At the May 16 hearing, the court asked whether Goes could obtain more concrete revenue information from its third-party subpoenas; Goes said that it could not, emphasized that Dodur's default prevented access to concrete revenue, and pointed to its CEO's observations of the display rates of ads (while he played the infringing game) as a justification for not accepting Dodur's numbers.[119]

The court accepts that the CEO's knowledge of the industry, playing the games, and watching the ad rate provides some justification for revenues but concludes that Goes' overall damages estimates are too speculative. The court credits the concrete revenue data that Dodur's capable prior counsel provided: $41,430.08 in worldwide revenues from Google Admob, $14,837.38 ($14,562.29 plus $275.09) in "Americas" revenues from Apple iAd, and $241.50 for U.S. in-app purchases in 2012 and 2013.[120] The court credits Goes' CEO's analysis that revenues should be higher in the first five months of the game's release (where Dodur omitted – or does not have – data.)[121] Extrapolating from these concrete numbers,[122] the court will enter judgment for infringer profits in the total amount of $35,241.50 based on the following: $25,000 (Google Admob), $10,000 (Apple iAd), and $241.50 (U.S. in-app purchases).

---

[117] *See* Statement.

[118] *See id.*

[119] Goes previously said at a hearing that it could determine from third-party subpoenas the U.S. downloads and revenue. Order – ECF No. 51 at 7.

[120] *See* Statement (citing Wang Decl., ECF No. 34-1 at 8–9 (¶ 27), 7 (¶ 24), and 11–12 (¶ 31)).

[121] Mäkilä Decl., ECF No. 37-1 at 13 (¶¶ 42–44).

[122] Given the relatively low amounts, the grounding in concrete numbers, the record it has, and Dodur's default, the court is willing — for U.S. downloads — to do some extrapolation from the actual revenue amounts. *See Livingston*, 2015 WL 4319851, at *10.

### 3.3 Discovery Sanctions

The court previously awarded Goes $7,245 in discovery sanctions and will include that amount in the judgment.[123]

### 3.4 Injunctive Relief

Goes asks the court to order the following permanent injunction: "The Court orders that Dodur is permanently enjoined from: (a) distributing any computer application or program that violates the copyrights of GOES in whole or in part through an American company, through American-based services, or through American servers, or (b) earning any revenue from infringing acts of GOES' copyrights through, in whole or in part, an American company or source."[124]

The Copyright Act authorizes the court to grant injunctive relief "as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). An injunction does not automatically follow a determination of infringement. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392 (2006). Instead, an injunction should issue to protect property rights against injuries otherwise irremediable. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

In fashioning an injunction, the court must consider (1) whether the plaintiff has suffered irreparable injury, (2) whether the plaintiff can be adequately compensated by a remedy at law such as monetary damages, (3) whether the balance of hardships between the plaintiff and defendant favors the plaintiff, and (4) whether the permanent injunction serves the public. *eBay*, 547 U.S. at 391. Dodur previously agreed to a stipulated judgment to address Goes' concern. The court finds an injunction is appropriate. *See Sega Enters. Ltd. v. MAPHIA*, 948 F. Supp. 923, 940 (N.D. Cal. 1996) ("Generally, a showing of copyright infringement liability and the threat of future violations is sufficient to warrant a permanent injunction.").

The court's injunction will be as follows:

---

[123] Order – ECF No. 128 at 1.

[124] Proposed Order – ECF No. 138-3 at 2.

Dodur is permanently enjoined from distributing any games, computer applications, or programs that infringe the copyrights for Goes' games, computer applications, or programs (including *Puzzle Bubble Free!* and *Puzzle Bubble Sea*).

## CONCLUSION

The court grants Goes' motion for default judgment, enters judgment in the amount of $35,241.50 in infringer profits and $7,245 for discovery sanctions, and enjoins Dodur from further infringing Goes' copyrights.

Goes must serve Dodur with a copy of this order.

**IT IS SO ORDERED.**

Dated: May 20, 2018

_____
LAUREL BEELER
United States Magistrate Judge